**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

SHERRY GEATHERS,

                    Plaintiff,

        -against-

ANDREW SAUL, Acting Commissioner
of Social Security,

                Defendant.

---------------------------------------------------------------x

18-CV-2346 (CM)(OTW)

**REPORT AND RECOMMENDATION**

      **ONA T. WANG, United States Magistrate Judge:**

      **TO THE HONORABLE COLLEEN MCMAHON**, **United States District Judge,**

**I. Introduction**

      Plaintiff brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). Plaintiff has moved for summary judgment pursuant to Fed. R. Civ. P. 56 and the Commissioner has cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

      For the reasons set forth below, I respectfully recommend that the Commissioner's motion (ECF 22) be denied and the Plaintiff's motion (ECF 15) be granted and the action be remanded.

## II. Facts[1]

### A. Procedural Background

Plaintiff filed an application for DIB on May 1, 2015, alleging that she became disabled on September 24, 2014 after a fight with a co-worker caused injuries to Plaintiff's neck, face and spine. (Tr. 10, 24-27, 53-85, 88, 261-62). Plaintiff's applications were initially denied on July 15, 2015. (Tr. 24, 87, 92-97, 101). At Plaintiff's request, administrative law judge ("ALJ") Denise M. Martin presided over a hearing on March 28, 2017, at which Plaintiff and an impartial vocational expert testified. (Tr. 24, 53-86, 113, 145). On April 19, 2017, Judge Martin issued a decision finding that Plaintiff was not disabled. (Tr. 24-33). On January 16, 2018, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4, 184).

### B. Social Background

Plaintiff was born in 1967 (Tr. 54) and was 47 years old at her alleged disability onset date. (Tr. 88). Plaintiff attended school up until the 10th grade and does not have a General Education Diploma, but she did receive home health care aide certification. (Tr. 54). Plaintiff has previously worked as a security guard, a customer service representative at 311, and a fire guard. (Tr. 55, 57-58, 226).

Plaintiff submitted a "Function Report – Adult – Form SSA-3373," to the Social Security Administration on May 22, 2015. (Tr. 211-233). Plaintiff reported that she had pain in her neck and back, which was getting increasingly worse. (Tr. 215-16). Plaintiff stated that in a typical

---

[1] Only the facts relevant to the Court's review are set forth here. Plaintiff's medical history is contained in the administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (*see* Administrative Record, dated September 4, 2018 (ECF 13) ("Tr.")).

day, she gets her son ready for school, drops him off at school, prepares meals for herself and her son, and completes chores. (Tr. 213-14). Plaintiff is able to dress herself, but she has trouble getting out of the bath tub and shower, and problems washing her back and legs. (*Id.*). Preparing meals can also be difficult because she cannot stand for long periods of time. (Tr. 215). As for other household chores, Plaintiff reported that she can "do just about everything, but with a lot of pain" and she has "to take [her] time." (*Id.*). Plaintiff also stated that she does not go out on the weekends because of her pain and depression. (*Id.*). She also alleged experiencing panic attacks due to her injury; since she was attacked from behind, Plaintiff feels nervous and anxious that someone will "walk[] up from behind [her]." (Tr. 221).

### C. Medical Background

#### 1. Treating Sources

##### a. Bellevue Hospital Center, Emergency Room Visit On Alleged Onset Date

On September 24, 2014, Plaintiff was seen at Bellevue Hospital Center for "neck pain and facial abrasion" after a purported assault by Plaintiff's co-worker. (Tr. 279). Dr. Alexander Baxter performed a CT scan of the cervical spine, which revealed a straightening of the cervical lordosis,[2] which may reflect spasm. (Tr. 278). Other aspects appeared normal, besides mild multilevel degenerative changes with facet hypertrophy,[3] most pronounced at C5-6. (*Id.*). The examination revealed no acute fractures or subluxation, and Plaintiff was ambulatory with a

---

[2] The dorsally concave curvature of the cervical vertebral column when seen from the side. *Dorland's Illustrated Medical Dictionary*, 1074 (32nd ed. 2012).

[3] Facet is defined as a small plane surface on a hard body, as on a bone. *Id*. at 668. Hypertrophy is defined as the enlargement or overgrowth of an organ or part due to an increase in size of its cells. *Id*. at 898. Here, degenerative changes with facet hypertrophy appears to refer to the enlarging or changing of facet joints located along the back of Plaintiff's spine due to age.

stable gait. (*Id*.). Plaintiff also had full range of motion of all extremities, no evidence of trauma/facial trauma, mild cervical spine tenderness. (Tr. 280).

### b.  Jacobi Medical Center

Two months later, Plaintiff reported experiencing increased pain in her neck. (Tr. 299). Plaintiff visited Jacobi Medical Center on December 22, 2014 where she was diagnosed with cervicalgia.[4] (Tr. 345). She returned on January 5, 2015. (Tr. 336-341). During these visits, Plaintiff was instructed to continue taking her prescribed medications, Motrin or Tylenol, along with a muscle relaxant, and referred to occupational therapy. (Tr. 339, 343, 369). Plaintiff's pain stayed in her neck and did not radiate or travel up or down; she reported no numbness or tingling, no pain radiating to her hands or arms and no weakness or balance problems. (Tr. 407).  Plaintiff had full muscle strength in all categories and normal reflexes. (Tr. 407-08). Her symptoms were described as likely secondary to a severe muscle strain. (Tr. 338, 403).

### c.  Douglas Schwartz, D.O.

Plaintiff was examined by Dr. Douglas Schwartz on February 24, 2015 in connection with her Workers' Compensation case. (Tr. 293). Pain was reproduced by palpation of the bilateral cervical/thoracic paraspinal[5] trigger points. (*Id*.). No atrophy was noted to Plaintiff's upper extremities. (*Id*.). A neurological exam highlighted that sensation to light touch/pinprick was diminished at the right C4, C5 and C6 dermatomes.[6] (Tr. 294). Muscle grade strength was reported to be 4 out of 5 at the cervical paraspinals as well as the right deltoids, biceps and

---

[4] Cervicalgia is a general term that describes neck pain. *See Smith v. Colvin*, No. 12-CV-5573, 2013 WL 4519782 at *4 n. 21 (E.D.N.Y. Aug. 26, 2013).

[5] Near the spine; pertaining to a plane along the spine. *Id*. at 1381.

[6] The area of skin supplied with afferent nerve fibers by a single posterior spiral root. *Id*. at 497.

wrist extensors. (*Id*.). Spurling,[7] foraminal compression and Valsalva[8] testing was reported to be positive on the right for the cervical nerve root irritation. (*Id*.). Plaintiff demonstrated normal heel and toe walking bilaterally and ambulated in a normal fashion without assistive devices. (*Id*.). Dr. Schwartz diagnosed Plaintiff with derangements of the cervical/lumbosacral spine "with probable underlying radiculopathy and/or herniated discs." (*Id*.). Dr. Schwartz indicated that Plaintiff was "totally disabled from any and all work." (*Id*.).

### d. Ariq Rabadi, D.C.

Plaintiff was first examined by Dr. Ariq Rabadi, a chiropractor, on January 19, 2015. (Tr. 283-84). Dr. Rabadi treated Plaintiff through June 2016. (Tr. 306-23, 496-544, 575-638, 640). At Plaintiff's initial visit, Dr. Rabadi conducted a cervical examination on Plaintiff, which revealed articular distress and tenderness on bilateral, greater on the right. (Tr. 283). Palpation of the cervical muscles revealed moderate spasms and myofascial[9] trigger points of the right cervical paravertebral muscle and right trapezius muscle. (*Id*.). The examination also indicated articular restrictions on the right C4-C7 as well as limited cervical range of motion due to pain and spasm. (*Id*.). Further, shoulder depression reproduced muscular complaints on the right and cervical compressions produced local articular complaints and muscle guarding on the right with tingling and numbness into the right upper extremities. (*Id*.). Dr. Rabadi noted that the

---

[7] The examiner presses down on the top of the head while the patient rotates the head laterally and into hyperextension; pain radiating into the upper limb ipsilateral to a rotation position of the head indicates radiculopathy. *Id*. at 1900.

[8] Forcible exhalation effort against a closed glottis. *Id*. at 1102.

[9] Pertaining to or involving the fascia surrounding and associated with muscle tissue. *Dorland's Illustrated Medical Dictionary*, at 1222.

Soto-hall sign[10] was positive for pain in the neck and the Adson Test[11] was positive for the right neck. Motor, reflex and sensory evaluations of the upper extremities were all within normal limits, except for a decrease in the right C7-C8 dermatomes. (Tr. 284). Dr. Rabadi diagnosed Plaintiff with cervical spine radiculitis,[12] spine sprain/strain, spine segmental dysfunction and muscle spasm. (*Id*.). Dr. Rabadi described Plaintiff's prognosis as fair and stated she was unable to return to work at this time. (*Id*.).

Dr. Rabadi continued to see Plaintiff for spinal manipulation and physiotherapy several days a week from January 2015 to June 2016. (Tr. 306-23, 496-544, 575-638, 640). After a motor vehicle accident in September 2015, Dr. Rabadi diagnosed Plaintiff with cervical intervertebral disc without myelopathy,[13] cervical radiculopathy[14] and cervical sprain/strain and indicated Plaintiff's prognosis as fair. (Tr. 607-08, 638-40). An MRI of the cervical spine on September 21, 2015, showed a shallow central protruding disc herniation abutting the cord at C5-6, a broad central disc herniation at C6-7 causing compression on the cord, and a broad right-sided disc herniation at C7-T1 narrowing the right-sided neural foramina, and abutting the right C6 nerve root. (Tr. 543). Plaintiff also received radiculopathy nerve testing on April 24, 2015 before filing for Social Security Benefits. (Tr. 306-09). The nerve testing indicated a slight abnormality at the right median motor nerve as well as the right median sensory nerve, but all

---

[10] With a patient lying supine, on flexion of the spine beginning at the neck and going downward, pain will be felt at the site of the lesion in back abnormalities. *Id*. at 1715.

[11] The sitting patient breathes in deeply and holds the breath, then hyperextends the neck and turns the head toward the affected side. If the radial pulse on that side is significantly diminished, the test is considered positive. The test has been found to be non-specific. *Id*. at 1885

[12] Inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal. *Id*. at 1571.

[13] Cervical myelopathy is a complication that occasionally arises from rheumatoid arthritis or osteoarthritis. *Dorland's Illustrated Medical Dictionary*, at 1220.

[14] Disease of the nerve roots, such as from inflammation or impingement by a tumor or body spur.

remaining nerves were within normal limits. (Tr. 307). Dr. Rabadi indicated moderate right

sensorimotor[15] median nerve neuropathy at the wrist, consistent with the clinical diagnosis of

carpal tunnel syndrome as well as right C6-C7 radiculopathy. (Tr. 308).

### e. Albert Graziosa, M.D.

Dr. Albert Graziosa, an orthopedic surgeon, examined Plaintiff on February 10, 2015, in

connection with her claim for Workers' Compensation benefits. (Tr. 299). The exam showed

Plaintiff as a well-developed, well-nourished individual with no apparent signs of distress. (Tr.

300). Evaluation of Plaintiff's cervical spine revealed tenderness on palpation over the C1-C7

with myospasm over the upper border of the trapezial muscle on palpation bilaterally. (*Id*.).

Plaintiff's right side was reportedly worse than her left. (*Id*.). The compression test, Spurling test

and Hoffman test were all negative. (*Id*.). Reports indicated a decreased range of motion with

pain and discomfort. (*Id*.). Dr. Graziosa reported Plaintiff as totally disabled with cervical spine

sprain and strain and possible cervical radiculopathy associated with mild degenerative changes

documented by a previous x-ray. (*Id*.).

Plaintiff returned to Dr. Graziosa's office several times throughout 2015 and 2016. (Tr.

302-05, 376-78, 490-94). Dr. Graziosa reported no change in Plaintiff's diagnosis between her

February and April visits. At Plaintiff's April 9, 2015 visit, examination of the cervical spine

revealed a mild spasm to the upper border of the trapezial muscle on palpation bilaterally. An

MRI documented reversal of cervical lordosis, which may represent muscle spasms as well as

C6-7 broad disc herniation abutting the cord and C5-6 central protruding disc herniation

---

[15] Both sensory and motor. *Id*. at 1693.

abutting the cord. (Tr. 304). At Plaintiff's April 2015 appointment, Dr. Graziosa referred Plaintiff

to pain specialist Dr. Marini as well as to a psychotherapist. (Tr. 305, 379-81). At Plaintiff's May

12, 2015 appointment, Plaintiff's physical examination revealed no change in her condition

since the previous visit. (Tr. 494). Plaintiff indicated feeling worse, however, at her July 2015

appointment. (Tr. 492). Dr. Graziosa's examination revealed diffuse amounts of spasm and

discomfort, especially into portions of the left trapezial area, as well as large trigger points

extending down into Plaintiff's mid-to-upper back. (*Id*.). The report also indicated numbness

and tingling into portions of the left lower extremity in association with spasm into mid-to-

lower back. (*Id*.). Plaintiff was diagnosed with lumbosacral[16] spine strain with associated

herniation at C5-6 and C6-7, possible radiculopathy and secondary transfer to the mid-to-lower

back with continued pain and discomfort. (*Id*.). Plaintiff was referred to Dr. Brotea, a spinal

surgeon, for a second opinion concerning the broad-based disc herniation in her cervical spine.

(Tr. 493). At her September 3, 2015 appointment, Plaintiff's diagnosis was changed to cervical

spine sprain with disc herniation at C5-6, C6-7 and possible radiculopathy as well as secondary

transfer to the mid-to-lower back with continued pain and discomfort, removing the July 2015

diagnosis of lumbosacral spine strain. (*Id*.). Plaintiff visited Dr. Graziosa again on October 20,

2015. (Tr. 546). Plaintiff reported that Dr. Brotea did not recommend any surgical management

to the cervical spine at this time. (*Id*.). Dr. Graziosa's examination of Plaintiff revealed

tenderness to palpation via C1-C7 with mild spasm to the border of the trapezial muscle on

palpation bilaterally. (*Id*.). The Spurling test was positive and deep tendon reflexes were

---

[16] Pertaining to the lumbar vertebrae and sacrum, or to the lumbar and sacral regions. *Dorland's Illustrated Medical Dictionary*, at 1076.

symmetrical bilaterally. (*Id*.). Plaintiff continued to experience ongoing pain to the cervical spine as well as secondary transfer to the lower back. (*Id*.). In his follow up medical report after each of Plaintiff's appointments in 2015, Dr. Graziosa indicated "total" under the heading "DISABILITY." (Tr. 300, 302, 304, 490). Plaintiff saw Dr. Graziosa twice in 2016. (Tr. 568-73, 780-81). At Plaintiff's June 16, 2016 appointment, Plaintiff was still somewhat tender to palpation, especially in portions of the mid-to-lower back. (Tr. 568). Dr. Graziosa again indicated "total" under the heading "DISABILITY." On September 15, 2016, Plaintiff's physical examination was "basically static and unchanged" with reports of significant amounts of tenderness and discomfort in portions of the mid-to-lower back; however, under "DISABILITY," Dr. Graziosa indicated "total from any heavy lifting or strenuous type activity." (Tr. 780).

### f. Robert Marini, M.D.

Dr. Robert Marini, M.D. treated Plaintiff for pain management from April 27, 2015 through January 2017. (Tr. 348-68, 454-62, 483-88, 548-63, 642-778, 782-811). Dr. Marini's initial evaluation indicated moderate swelling and tenderness of the right side of Plaintiff's cervical spine as well as positive Spurling sign and decompression. (Tr. 351). Plaintiff complained of neck and back pains. (Tr. 483). Dr. Marini diagnosed Plaintiff with cervical radiculopathy, cervical herniated disc and myofascial muscle pains, prescribed Plaintiff pain medication and recommended Plaintiff receive cervical epidural steroid injections. (Tr. 351).

Plaintiff received the steroid injections on May 8, 2015, June 3, 2015 and August 28, 2015. (Tr. 454, 484-87, 550, 643, 653). Plaintiff reported increased functional mobility following the injections, but also indicated worsening pain in her neck and lower back. (Tr. 483). Dr. Marini changed Plaintiff's diagnosis at her October 23, 2015 appointment to include only

cervical radiculopathy and myofascial muscle pain. (Tr. 552, 556, 645, 709). Cervical facet injections were performed in December 2015, January 2016 and February 2016. (Tr. 655-58, 664-69, 682). Records indicate a 50% improvement following Plaintiff's cervical facet injections as well as increased functional mobility. (Tr. 664, 686). However, Plaintiff indicated that the pain was starting to return at her April 12, 2016 appointment. (Tr. 686).

Dr. Marini's notes repeatedly indicate that Plaintiff was "unable to work" and was "totally disabled." (Tr. 349-65, 455-60, 550-60, 643,807). He also repeatedly indicated that plaintiff was independent in self-care, able to get up and walk independently, able to lift up to ten pounds occasionally, and unable to climb one flight of stairs. (Tr. 349-65, 455-60, 550-60, 643-807). On December 27, 2016, Dr. Marini completed a form stating Plaintiff had reached "maximum medical improvement," but he did not fill out the part of the form asking whether plaintiff had a permanent impairment, or the part of the form asking the doctor to evaluate plaintiff's functional abilities. (Tr. 797). Dr. Marini checked the box for "sedentary work," which was defined as requiring exerting up to ten pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, and involving sitting most of the time with walking or standing for brief periods. (Tr. 798).

### g. Robert A. Sohn, D.C.

Plaintiff visited Dr. Robert Sohn on March 12, 2015 to receive an independent chiropractic examination. (Tr. 324-329, 841-851). Dr. Sohn noted that Plaintiff was able to get on and off the examination table without assistance, was in no acute distress and was able to turn from a supine position to a prone positon without assistance. (*Id*.). Further, Plaintiff could rise from a seated to a standing position with no difficulty. (*Id*). Plaintiff had normal ranges of

motion of her cervical spine and all cervical orthopedic tests performed were negative. (*Id*.).

Plaintiff's upper and lower cervical spine revealed no evidence of muscle spasms, tenderness or

trigger points. (*Id*.). Dr. Sohn's impression of Plaintiff, based upon the chiropractic physical

examination performed and the history as provided by the Plaintiff, was that Plaintiff sustained

a cervical sprain/strain injury that "has fully resolved." (*Id*.).

### h. Peter C. Kwan, M.D.

At an April 3, 2015 appointment with Dr. Peter Kwan, a neurologist, Plaintiff presented

complaining of neck pain and daily lower cervical pain radiating down her right hand. (Tr. 468).

Plaintiff's mental status examination revealed her to be alert, awake and oriented. (*Id*.). A

neuromuscular exam of Plaintiff's cervical spine region exposed bilateral lower cervical

paraspinal tenderness on deep palpation with moderate spasm. (Tr. 469). Plaintiff did not

possess full range of motion during the examination, but a sensory examination revealed no

abnormalities. (*Id*.). Based on Plaintiff's history and examination, Dr. Kwan diagnosed Plaintiff

with traumatic injury of the cervical spine and ruled out any traumatic cervical disc herniation.

(Tr. 470). Dr. Kwan noted that Plaintiff was 100% temporarily impaired and totally disabled at

the time of the exam. (*Id*.). At Plaintiff's follow-up appointment on May 1, 2015, Plaintiff

indicated that her left shoulder was "burning." (Tr. 466). Following the results of an MRI

conducted on April 9, 2015, Dr. Kwan altered his medical to include cervical disc herniation at

C6-C7 with protruding disc herniation at C5-C6. (*Id*.). Plaintiff's final appointment with Dr. Kwan

was on June 5, 2015. (Tr. 464-65). Plaintiff reported improving neck pain radiating down to her

right hand. (Tr. 464). Dr. Kwan's May 1 diagnosis remained unchanged. (*Id*.). Plaintiff's

prognosis for recovery was described as guarded. (*Id*.). Further, Plaintiff was described as totally

disabled and unable to perform vocational rehabilitation at the time of the evaluation. (Tr. 465).

### 2. Consulting Sources

#### a. Johnathan Levinson, Psy. D.

On April 21, 2015, Dr. Johnathan Levinson, a licensed psychologist, examined Plaintiff for a consultative psychiatric evaluation. Plaintiff reported no previous psychiatric history of anxiety, depression or panic attacks before September 2014. (Tr. 296). Plaintiff expressed her concerns regarding recovering from her injuries and returning to work. (*Id*.). She reported experiencing mild auditory hallucinations, but she denied delusions or suicidal or homicidal ideation. (*Id*. at 296-97). Dr. Levinson diagnosed Plaintiff with major depressive disorder with psychotic features, chronic posttraumatic stress disorder and sleep disorder due to chronic pain. (Tr. 297). Dr. Levinson opined that Plaintiff was partially disabled at the time of evaluation. (*Id*.).

#### b. John Nikkah, Ph. D.

On June 29, 2015, Dr. John Nikkah, Ph. D., examined Plaintiff for a consultative psychiatric evaluation. (Tr. 472-476). Plaintiff reported difficulty falling and staying asleep due to her pain as well as depressed moods, crying spells, loss of usual interests, irritability and difficulties concentrating. (Tr. 473). Plaintiff also reported feeling anxious, but she denied having panic attack symptoms or cognitive deficits. (*Id*.). Her thought processes were coherent and goal-directed with no evidence of hallucinations, delusions or paranoia. (Tr. 474).

Plaintiff reported that she smoked marijuana one to two times a month, but she denied the present or past use of any other drugs or alcohol. (Tr. 473). Plaintiff's mood was neutral, and her attention and concentration were only mildly impaired. (Tr. 474). Plaintiff reported that she did not need any significant assistance to complete her daily tasks, but she did state that she takes longer perform tasks due to pain, limited mobility and lack of motivation. (Tr. 475).

According to Dr. Nikkah, Plaintiff demonstrated the ability to follow and understand simple directions and instructions, learn new tasks, perform simple tasks independently and relate adequately with others. (*Id*.). Dr. Nikkah assessed mild limitations in Plaintiff's ability to maintain attention and concentration, maintain a regular schedule, perform complex tasks independently, make appropriate decisions, and appropriately deal with stress. (*Id*.). Dr. Nikkah indicated that the results of Plaintiff's examination align with psychiatric and substance abuse problems, but, by itself, each problem did not appear significant enough to interfere with Plaintiff's ability to function on a daily basis. (*Id*.). Dr. Nikkah diagnosed adjustment disorder with mixed anxiety and depressed mood, and cannabis use disorder. (*Id*.).

### c. Douglas Greenfield, M.D.

On June 29, 2015, Dr. Douglas Greenfield saw Plaintiff for a consultative internal medical exam. (Tr. 478-81). Plaintiff reported dull and variable pain in her right neck, down her right arm, in her upper and mid-back as well as across her shoulders. (*Id*.). The pain was exacerbated when Plaintiff turned her neck to the right and carried or lifted objects, walked up stairs or sat in chairs. (*Id*.). Plaintiff also explained that her symptoms were worsened by exposure to the cold. (*Id.*). She also reported being treated for depression through therapy. (*Id*.).

Plaintiff reported smoking about five cigarettes per day, consuming alcohol once per week as well as past marijuana and cocaine use. (Tr. 479). Plaintiff appeared to be in no acute distress and walked with a normal gait. (*Id.*). Plaintiff completed a full squat, used no assistive devices, did not need assistance changing for the exam or getting on and off the examination table, and rose from her chair without difficulty. (*Id.*). Dr. Greenfield reviewed the results of Plaintiff's April 9, 2015 MRI. (Tr. 478). The MRI indicated shallow reversal of the cervical lordosis, which may represent muscle spasm, C6-7 broad disc herniation abutting the cord and a C5-6 central protruding disc herniation abutting the cord. (*Id.*).

Dr. Greenfield's muscoskeletal examination of Plaintiff revealed that her cervical spine was somewhat anteriorly displaced and mildly tender posteriorly. (Tr. 480). Plaintiff's spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (*Id.*). Her thoracic spine was mildly tender, but no abnormalities were reported. (*Id.*). Plaintiff's lumbar spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally. (*Id.*). She had full range of motion of her shoulders, elbows, forearms, wrists, hips, knees and ankles. (*Id.*). Her joints were stable and non-tender. (*Id.*).

Dr. Greefield's neurological examination indicated normal sensation on Plaintiff's left upper extremity and bilateral lower extremities as well as decreased sensation to pinprick, light touch and vibration in the right upper extremity. (*Id.*). Plaintiff's fine motor activity of her hands and fingers were intact and her grip strength was 5/5 bilaterally. (Tr. 481). Dr. Greenfield diagnosed Plaintiff with cervical spine pain and thoracic spine pain; he noted her prognosis as "good" and detailed that, based on the examination, Plaintiff had no limitations. (*Id.*).

### d. Alvin M. Bregman, M.D.

Dr. Alvin Bregman, an orthopedic surgeon, examined Plaintiff on March 17, 2016. (Tr. 813-820, 823-840, 853-869). Plaintiff reported neck and back pain, explaining that her pain had worsened since a motor vehicle accident on September 8, 2015. (Tr. 826). After reviewing Plaintiff's medical records, Dr. Bregman performed his own orthopedic examination of Plaintiff's cervical spine, which revealed normal lordosis. (Tr. 827). Dr. Bregman palpated the cervical paraspinal region using light touch and reported no paraspinal muscle spasm. (*Id*.). Plaintiff's cervical ranges of motion were all within the normal range, except for her right rotation, which was reported at 0 to 65 degrees (normal is 0 to 70 degrees). (*Id*.).

Dr. Bregman's neurological examination of Plaintiff revealed a muscle strength graded at 5/5 in the biceps, triceps, wrist flexor and extensor bilaterally, firm grasping power in both hands and no radiation of pain or paresthesia. (Tr. 827). Dr. Bregman diagnosed Plaintiff with a resolved sprain of the cervical spine. (*Id*.). Based on his examination, Dr. Bregman reported that there was no medical necessity for further treatment from an orthopedic standpoint or for physical therapy. (*Id*.). Dr. Bregman also opined that Plaintiff has no disability based on the NYS Workers' Compensation Board's Medical Guidelines, and that Plaintiff could return to work without restrictions or limitations. (*Id.*). He graded her prognosis as good. (*Id*.).

## D. Non-Medical Evidence: March 28, 2017 Hearing

### 1. Plaintiff's Testimony

Plaintiff testified before ALJ Denise M. Martin on March 28, 2017. (Tr. 53-81). Plaintiff stated that she was unable to work due to injuries she received when she was assaulted at

work in September 2014, and injured her face, neck, and spine. (Tr. 59-62). Plaintiff testified that she was treated with physical therapy, medication and injections. (Tr. 65). The first injection she received helped to slightly mitigate her pain, but the other injections did not. (Tr. 65). At the time of the hearing, Plaintiff was participating in physical therapy several times a week for her neck. (*Id*.). She explained that if she turns her head too quickly, she experiences a sharp pain in her back like "somebody punched [her]." (Tr. 70). Plaintiff testified that she was told there was no treatment to fix her neck or hand pain, except "an operation" for her neck pain. (Tr. 65-66). She explained that her pain was getting worse. (*Id.*).

Plaintiff was also diagnosed with carpal tunnel in her right hand, and at the time of the hearing, had also began to experience pain in her left hand. (Tr. 66). Plaintiff is right-hand dominant and, at the time of the hearing, had been wearing a brace on her right hand for two months. (*Id.*). Her right hand often "dips" when she tries to lift something up because the weight of the object "bends [her] hand back." (Tr. 67). Plaintiff testified that she burned and cut her hand without realizing because she has limited feeling in the hand. (Tr. 69).

Plaintiff testified that she has her son carry the groceries in his backpack because she cannot lift any heavy items. (Tr. 71). Plaintiff estimated that she could lift around five pounds, but she would not be able to hold the items for a significant period of time before her hand started to go numb and hurt. (*Id*.). Plaintiff reported that she can stand for no longer than two hours at a time and sit for no longer than two hours at a time before needing to change her positioning. (*Id*.). Over the course of an 8-hour work shift, she believes she would only be able to walk for a maximum of two hours and would not be able to complete her past security job. (Tr. 74). Plaintiff is able to cook and wash the dishes with the help of her brother. (Tr. 72). It

takes her around two days to clean the whole house because the reaching and scrubbing motions involved in such tasks cause her pain. (Tr. 73). She is unable to lift a gallon of milk out of the refrigerator with ease. Plaintiff explained that she is only able to sleep for two consecutive hours before having to get up because she is in pain. (*Id*).

## 2. Vocational Expert's Testimony

Vocational expert ("VE") Joanne Sell testified via telephone at the hearing. (Tr. 82). The VE testified that Plaintiff's prior work as a security guard was classified as light work, with a specific vocational preparation ("SVP") of 3. Plaintiff's prior work as a dispatcher was classified as sedentary work, with an SVP of 5. (Tr. 82-83).

ALJ Martin asked the VE to consider a hypothetical person of the same age, education and work background as the Plaintiff, limited to light work and frequent, but not repetitive, handling and fingering with the right upper extremity. (Tr. 83). The VE testified that such a person would be capable of performing Plantiff's past work of security guard and dispatcher. (*Id*.). In a second hypothetical, ALJ Martin asked the VE to reduce that hypothetical individual's exertional limitation from light to sedentary work, but to keep the limitation of frequent handling and fingering with the right upper extremity. (*Id*.). The VE testified that such a person could also perform Plaintiff's past work of security guard and dispatcher. (*Id*.).

When asked whether jobs in the national economy existed that would accommodate the first hypothetical individual, the VE explained that there existed three such representative occupations. (*Id*.). Such an individual could work as an information clerk, a mail clerk or an office clerk, all of which are performed at the light exertional level and have an SVP of 2. (Tr.

84). According to the VE, in the national economy there were 87,000 information clerk positions, 72,000 mail clerk positions and 234,000 office clerk positions. (*Id*.).

When asked whether jobs would exist for the second hypothetical individual if such individual's fingering and handing with the dominant right upper extremity was modified to be occasional, not frequent, the VE testified that no jobs would exist. (*Id*.). Further, when asked whether the individual in the first hypothetical could find work if she needed to be off task for at least 15% of the work day, the VE testified that no employment existed for such person. (Tr. 85). Similarly, the VE testified that no employment would exist for an individual in ALJ Martin's other hypothetical if that same limitation of 15% off task was added. (*Id.*).

III.    **Analysis**

A.    **Applicable legal principles**

1.    **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support the determination or whether it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012); *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).[17] Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Burgess*, 537 F.3d at 128).

---

[17] The standards that must be met to receive supplemental security income benefits under Title XVI of the Social Security Act are the same as the standards that must be met in order to receive DIB under Title II of the statute. *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Accordingly, cases addressing either claim are equally applicable to the issues before the Court.

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Talavera*, 697 F.3d at 151. Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Selian*, 708 F.3d at 417 (citation omitted).

## 2.      Determination of Disability

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months). In addition, to obtain DIB, the claimant must have become disabled before the date on which she was last insured. See 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; *McKinstry v. Astrue*, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be "of such severity" that the claimant cannot perform her previous work and "cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (internal quotation marks omitted)).

The Commissioner must follow the five-step process required by the regulations to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4)(i)—(v); *see Selian*, 708 F.3d at 417-18; *Talavera*, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i). If she is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments is "not severe" within the meaning of the regulation when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. (Tr. 25 (citing 20 C.F.R. § 404.1521; Social Security Rulings 85-28, 96-3p, and 96-4p)). If Plaintiff has a severe impairment or combination of impairments, the inquiry at the third step is whether any of these impairments meet or medically equal one of the criteria of an impairment listed in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). To be found disabled based on a Listing, the claimant's medically determinable impairment must satisfy all of the criteria of the relevant Listing. 20 C.F.R. § 404.1525(c)(3); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (summary order). If the claimant meets a Listing, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the Listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform her past relevant work given her RFC. 20 C.F.R. § 404.1520(f); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If she cannot, then the fifth step requires assessment of

whether, given claimant's RFC, she can make an adjustment to other work. 20 C.F.R. §404.1520(a)(4)(v). If she cannot, she will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (quoting Social Security Ruling 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). The results of this assessment determine the claimant's ability to perform the exertional demands[18] of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy. 20 C.F.R. § 404.1567; *see Schaal v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This ability may then be found to be limited further by non-exertional factors that restrict claimant's ability to work. *See Michaels v. Colvin*, 621 Fed. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove that the claimant's RFC allows the claimant to perform some work other than her past

---

[18] Exertional limitations are those which "affect [plaintiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). In contrast, non-exertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching. 20 C.F.R. § 404.1569a(c).

work. *Selian*, 708 F.3d at 418; *Burgess*, 537 F.3d at 128; *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. *See Butts*, 388 F.3d at 383. "The [Medical-Vocational Guidelines] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the [Medical-Vocational Guidelines] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." *Pagan v. Colvin*, 15-CV-3117 (HBP), 2016 WL 5468331, at *9 (S.D.N.Y. Sept. 29, 2016) (quoting *Gray v. Chater*, 903 F. Supp. 293, 298 (N.D.N.Y. 1995) (internal quotation marks omitted; alterations in original)); *see Butts*, 388 F.3d at 383.

Exclusive reliance on the Medical-Vocational Guidelines is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986); *accord Butts*, 388 F.3d at 383 ("sole reliance on the [Medical Vocational Guidelines] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform.") (citation omitted). "Significantly diminish" means an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive [her] of a meaningful employment opportunity." *Bapp*, 802 F.2d at 606; *accord Selian*, 708 F.3d at 421; *Zabala*, 595 F.3d at 411. When the ALJ finds that the non-exertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other

similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform." *Butts*, 388 F.3d at 383-84 (internal quotation marks and citation omitted); *see also Heckler v. Campbell*, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

### 3.     Treating Physician Rule

The "treating physician rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.[19] A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *Diaz v. Shalala*, 59 F.3d 307, 313 n.6 (2d Cir. 1996); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight." 20 C.F.R. § 404.1527(c)(2); *Schisler*, 3 F.3d at 568; *Burris v. Chater*, 94-CV-8049 (SHS), 1996 WL 148345, at *4 n.3 (S.D.N.Y. Apr. 2, 1996). The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'" *Morgan v. Colvin*, 592 F.

---

[19] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017); *accord Cortese v. Comm'r of Social Sec.*, 16-CV-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017).

App'x 49, 50 (2d Cir. 2015) (summary order) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)); accord *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (c) (2)—(6); *Schisler*, 3 F.3d at 567; *Mitchell v. Astrue*, 07-CV-285 (JSR), 2009 WL 3096717, at *16 (S.D.N.Y. Sept. 28, 2009); *Matovic v. Chater*, 94-CV-2296 (LMM), 1996 WL 11791, at *4 (S.D.N.Y. Jan. 12, 1996). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran*, 362 F.3d at 32-33; *see also Atwater*, 512 F. App'x at 70; *Petrie v. Astrue*, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); *Kennedy v. Astrue*, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order). "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) (summary

order) (citation omitted); *see also Monroe v. Comm'r of Social Sec.*, 676 F. App'x 5, 7 (2d Cir. 2017) (summary order). The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a treating physician's determination to this effect where it is contradicted by the medical record. *See Wells v. Comm'r of Soc. Sec.*, 338 F. App'x 64, 66 (2d Cir. 2009) (summary order). The ALJ may rely on a consultative opinion where it is supported by substantial evidence in the record. *See Richardson*, 402 U.S. at 410; *Camille v. Colvin*, 652 F. App'x 25, 27-28 (2d Cir. 2016) (summary order); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *Mongeur*, 722 F.2d at 1039.

**B.      The ALJ's Decision**

ALJ Martin applied the five-step analysis described above and determined that Plaintiff was not disabled. (Tr. 24-33).

As an initial matter, ALJ Martin found that Plaintiff met the insured status requirement of the Social Security Act through December 31, 2019. (Tr. 26).

At step one, ALJ Martin found that Plaintiff had not engaged in substantial gainful employment activity since September 24, 2014, the alleged disability onset date. (Tr. 26).

At step two, ALJ Martin found that Plaintiff had the following severe impairments: (1) degenerative disc disease; (2) muscle spasm; and (3) carpal tunnel syndrome (20 C.F.R. 404.1520(c)). (Tr. 24). ALJ Martin followed a two-step process in which she first determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the Plaintiff's symptoms; and second, the extent to which the plaintiff's symptoms limit her functioning, based on their intensity, persistence and

limiting effects. (Tr. 26). Following this process, ALJ Martin found that Plaintiff's degenerative disc disease, muscle spasm, and carpal tunnel syndrome impose more than a minimal functional limitation on Plaintiff's ability to perform basic work activity. (Tr. 28). As to Plaintiff's obesity, gastritis, sleep disorder, depression, anxiety, or post-traumatic stress disorder, ALJ Martin found that these impairments exist but are nonsevere. (*Id.*).

ALJ Martin also found that Plaintiff's mental impairments cause mild difficulties in understanding, remembering or applying information, mild difficulties in interacting with others, mild difficulties in maintaining concentration, persistence or pace and mild difficulties in adapting or managing herself. (*Id.*). In making these findings, ALJ Martin gave "great weight" to the assessment provided by Dr. Nikkah. (*Id.*). Dr. Nikkah found Plaintiff's thought process to be coherent and goal-directed, with "no evidence" of hallucinations or delusions. (*Id.*). Likewise, Dr. Nikkah indicated that Plaintiff's psychiatric issues were not "significant enough to interfere" with Plaintiff's ability to function on a daily basis. (*Id.*).

At step three, ALJ Martin found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 29). In reaching her conclusion, ALJ Martin stated that she considered the applicability of several listings, including 1.02, 1.04, 11.14, 12.04 and 12.06. ALJ Martin also noted that "the medical evidence does not document listing-level severity," and "no acceptable medical source has observed deficits equivalent in severity to the criteria of any listed impairment, individually or in combination." (*Id.*).

ALJ Martin then determined that Plaintiff retained the RFC to perform "light" work,[20] except that Plaintiff would be limited to frequent—but not repetitive—handling and fingering with her right upper extremity. (*Id*.). To reach this RFC determination, ALJ Martin examined Plaintiff's symptoms and the extent to which her symptoms were reasonably consistent with the objective medical evidence and other evidence. (Tr. 30-31). ALJ Martin found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [] not entirely consistent with the medical evidence." (Tr. 29). In essence, ALJ Martin was "not persuaded that [Plaintiff] is quite as limited as alleged." (*Id*.).

ALJ Martin also considered the opinions of the treating and consulting physicians. (*Id*.). ALJ Martin gave "great weight" to Dr. Greenfield's assessment, in which he opined that Plaintiff had "no [physical] limitations" and predicted that her prognosis was "good." (Tr. 30). ALJ Martin summarized Dr. Greenfield's examination findings as follows:

> Dr. Greenfield's examination revealed that the claimant walked with a normal gait and used no assistive device to do so. She was able to walk on her heals [sic] and on her toes "without difficulty," and she required no assistance changing for the exam or getting on/off the exam table. With respect to her musculoskeletal system, although her cervical spine was somewhat "displaced" and "mildly tender," it had full flexion, extension, lateral flexion, and rotary movement. (Ex. 14F.) The claimant also exhibited full range of motion with respect to her shoulders, elbows, forearms, wrists, hips, knees, and ankles. Even her joints were

---

[20] The regulations define "light work" as that work which

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities

> 20 C.F.R. § 404.1567(b). "Since frequent lifting or carrying requires being on one's feet up to two-thirds of the workday, the full range of light work requires standing or walking, off and on, for a total of 6 hours of an 8-hour workday." Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *6 (1983).

stable and nontender. To be sure, the claimant had some decreased right arm sensation, light touch, and vibration. Nonetheless, her strength was "5/5" in every extremity, and her hand/finger dexterity was intact.

(Tr. 30). Dr. Greenfield opined that Plaintiff had "no [physical] limitations" and predicted that her prognosis was "good." (*Id.*). ALJ Martin noted that De. Greenfield examined Plaintiff, his examination was "seemingly thorough," and he provided a detailed report outlining his findings. (*Id.*).

ALJ Martin also gave "substantial weight" to Dr. Bregman's December 2016 assessment, in which Dr. Bregman indicated the Plaintiff's cervical spine sprain had "resolved" and concluded that Plaintiff had "no disability" and was able to return to work "without restrictions or limitations." (*Id.*). ALJ Martin explained that she gave substantial weight to Dr. Bregman's assessment "in light of its detail and consistency with Dr. Greenfield's report." (*Id.*). ALJ Martin acknowledged, however, that she found it "slightly unreasonable" for Dr. Bregman to find no limitations; still, ALJ Martin explained that Dr. Bregman's analysis was indicative of Plaintiff's ability to perform certain types of light work on a full-time basis. (*Id.*).

ALJ Martin also acknowledged that "several doctors have indicated that [Plaintiff] is either disabled or limited to sedentary work." (*Id.*). ALJ Martin stated that she did not find the evidence set forth by Dr. Schwartz, Dr. Kwan, Dr. Marini or Dr. Graziosa to be "particularly persuasive" because their reports were "vague" and "it is unclear whether the physicians were knowledgeable of the precise definition of 'disability' used in the Social Security Act." (*Id.*). Further, ALJ Martin stated that "these doctors' statements are inconsistent with the opinion evidence provided by Drs. Nikkah, Bregman, and Greenfield," and inconsistent with the

"objective evidence," which revealed only "mild degenerative changes and straightening" of Plaintiff's cervical spine, undercutting Plaintiff's allegations of severity. (Tr. 30-31).

At step four, the ALJ concluded that Plaintiff was capable of performing her past work as a "security guard" and as a "dispatcher." (Tr. 31). ALJ Martin made this finding after reviewing Plaintiff's work history reports, earnings records, and the vocational expert's testimony. (Tr. 31). Still, ALJ Martin provided an alternative finding for step five of the sequential evaluation process. Relying on the testimony of the vocational expert, ALJ Martin found that jobs existed in significant numbers in the national economy that Plaintiff could perform, given her RFC, age, education and work experience. (Tr. 32). ALJ Martin noted that the vocational expert testified that given Plaintiff's age, education, work experience, and RFC, Plaintiff could perform work as an information clerk, which has 87,000 jobs in the national economy, mail clerk, which has 72,000 jobs in the national economy, and office clerk, which has 234,000 jobs in the national economy. (Tr. 32). Concluding that the expert's testimony was consistent with the information in the Dictionary of Occupational Titles, ALJ Martin determined that Plaintiff could perform those occupations and, accordingly, was not disabled. (*Id*.).

C.     **Analysis of the ALJ's Decision**

Plaintiff argues that remand is required because ALJ Martin failed to give controlling weight to the opinions of Plaintiff's treating physicians, Dr. Rabadi, Dr. Graziosa, Dr. Marini, and Dr. Kwan, and that, therefore, ALJ Martin's assessment of Plaintiff's RFC is not supported by substantial evidence. Defendant argues that the Commissioner's decision is supported by substantial evidence.

### 1.      ALJ Martin's Evaluation of the Treating Physicians

The SSA regulations provide that the medical opinions of a Plaintiff's treating physician deserve special deference. 20 C.F.R. § 404.1527(c)(2). When a claimant's treating physician offers an opinion on the "nature and severity" of the claimant's impairments, the physician's opinion is entitled to "controlling weight," so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and consistent with "the other substantial evidence in [the] case record." *Id.* However, a treating physician's opinion that a claimant is "disabled" or "unable to work" "is not entitled to controlling weight because the presence or absence of a disability is a legal question reserved to the Commissioner." *Pichardo v. Commissioner of Social Security*, 2015 WL 6674822 (KPF), at *10 (S.D.N.Y. Oct. 30, 2015). Where, however, "an ALJ rejects a treating physician's opinion that a claimant is "disabled," the ALJ still has an obligation to explain why the physician's opinion is not being credited." *Id.* (internal citations omitted). Failure to provide "good reasons" can be reversible error. *See Snell v. Apfel*, 177 F.3d 128, 177 (2d Cir. 1999). "That said, a reviewing court will not reverse an ALJ's decision for failure to discuss a treating physician's opinion if there is 'no reasonable likelihood' that the opinion could have changed the ALJ's disability determination." *Pichardo*, 2015 WL 6674822, at *10 (citing *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

Plaintiff argues that ALJ Martin improperly applied the treating physician rule by "fail[ing] to accord any weight" to Dr. Rabadi, Dr. Graziosa, Dr. Marini, and Dr. Kwan, and by "provid[ing] no explanation as to why no weight was accorded." (Pl's Mem. of Law at 16). At the outset, Plaintiff's arguments are overstated. Although ALJ Martin did not specify how much weight she gave to Dr. Graziosa, Dr. Marini, and Dr. Kwan, noting instead that she "did not find

such evidence particularly persuasive," (Tr. 30), ALJ Martin did provide her reasoning: she found the physicians' reports' "vague," "it [was] unclear whether the physicians were knowledgeable of the precise definition of 'disability' used in the Social Security Act," "th[e] doctors' statements [were] inconsistent with the opinion evidence" provided by Drs. Bregman and Greenfield" and "objective evidence undercuts [Plaintiff's] allegations." (Tr. 30-31).

A review of the record shows that Dr. Graziosa did not provide a medical opinion on Plaintiff's functional abilities or limitations, and thus there was no need for ALJ Martin to apply the rule to him. *See* 20 C.F.R. § 404.1527(a)(1)("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). While Plaintiff relies on Dr. Graziosa's reports, which do indicate Dr. Graziosa's findings at the time that Plaintiff had a "total" disability, such a statement is on an issue reserved to the Commissioner, and thus not entitled to any weight or special significance. *See* 20 C.F.R. § 404.1527(d)(1) (an opinion concerning the ultimate issue of disability under the Social Security Act is reserved to the Commissioner); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."); Social Security Ruling (SSR) 96-5p, 1996 WL 374183 (treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight). Moreover, Dr. Graziosa's final report indicated that Plaintiff's disability was "total from any heavy lifting or strenuous type activity." This finding, to the extent it is a medical opinion, supports ALJ Martin's RFC determination.

Additionally, ALJ Martin did not need to give controlling weight to Dr. Marini's opinion that Plaintiff was "unable to do any work." (Tr. 349-65, 455-60, 550-60, 643,807). Such a statement is on an issue reserved for the Commissioner and not entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(1); *see also Snell*, 177 F.3d 128 a 133; Social Security Ruling (SSR) 96-5p, 1996 WL 374183. Further, Dr. Marini indicated in a report to the Workers' Compensation Board on December 27, 2016 that Plaintiff had reached "maximum medical improvement" and could perform "sedentary work." (Tr. 798). ALJ Martin acknowledged Dr. Marini's findings, but provided her reasons for discounting it, namely, that such a limitation was inconsistent with both objective evidence, which indicated only mild degenerative changes and straightening, and opinion evidence provided by consultative examiner Dr. Greenfield and treating orthopedic surgeon Dr. Bregman. Moreover, Dr. Marini did not provide any explanation for his opinion, leaving blank the portion of the form which asked whether a permanent impairment existed. (*Id.*). Dr. Marini also did not fill out of the portion of the form asking about Plaintiff's functional capabilities and exertional abilities in terms of lifting, carrying, sitting, standing, walking, simple grasping, fine manipulation, or reaching overhead. (*Id.*).

Dr. Kwan also did not provide a medical opinion on Plaintiff's functional abilities or limitations, and thus there was no need for ALJ Martin to apply the rule to him. *See* 20 C.F.R. § 404.1527(a)(1). Dr. Kwan described Plaintiff as having a "100% of temporary impairment" and being "totally disabled." Again, such statements are opinions on the ultimate issue of disability, an issue reserved to the Commissioner, and are not entitled to special significance. *See* 20 C.F.R. § 404.1527(d); *see also Snell*, 177 F.3d 128 a 133; Social Security Ruling (SSR) 96-5p, 1996 WL 374183. Moreover, Plaintiffs final appointment with Dr. Kwan was in June 2015. At that

time, he had opined that Plaintiff's impairment was "temporary." It was thus appropriate for ALJ Martin to give greater weight to Dr. Bregman, who conducted "an independent orthopedic re-examination" in December 2016. Finally, Dr. Rabadi and Dr. Sohn are chiropractors. Because a chiropractor is not an acceptable medical source, their opinions are not due controlling weight. 20 C.F.R. § 404.1502(a); *see Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995) (chiropractor is not an acceptable medical source and cannot provide a medical opinion). Thus, for the reasons stated above, ALJ Martin did not violate the treating physician rule by failing to afford Dr. Rabadi's, Dr. Graziosa's, Dr. Marini's, and Dr. Kwan's opinions *controlling* weight.

Where an ALJ rejects a treating physician's opinion that a claimant is "disabled," however, the ALJ still has an obligation to explain why the physician's opinion is not being credited, and in doing so, must address all the pertinent evidence. *See Calzada v. Astrue*, 753 F. Supp. 2d 250, 278 (S.D.N.Y. Nov. 17, 2010) (remanding in part because ALJ's decision did not explain why an MRI evidencing a small disc herniation in close relation to a nerve in plaintiff's lumbar spine was insufficient to support the conclusions of [the treating physicians]). Here, while ALJ Martin provided several reasons applicable to each treating physician for discounting their opinions, her decision omitted any mention of the fact that Dr. Graziosa, Dr. Marini, Dr. Kwan, and Dr. Greenfield diagnosed Plaintiff with disc herniation. Dr. Graziosa diagnosed Plaintiff with cervical spine sprain with disc herniation at C5-6 and C6-7, (Tr. 493), Dr. Marini diagnosed Plaintiff with cervical herniated disc (a diagnosis he later removed), (Tr. 351), Dr. Kwan, following the results of an April 9, 2015 MRI, diagnosed Plaintiff with cervical disc herniation at C6-C7 with protruding disc herniation at C5-C6, but "rule[d] out traumatic cervical disc herniation," (Tr. 466), and Dr. Greenfield found "[t]here is a C6-7 broad disc herniation

abutting the cord and a C5-6 central protruding disc herniation abutting the cord." (Tr. 478).

Further, Dr. Graziosa and Dr. Marini both diagnosed Plaintiff with cervical radioculopathy. (Tr.

300, 351, 492). ALJ Martin's decision did not mention these impairments. Therefore, by failing

to address this evidence, ALJ Martin committed a legal error that requires a remand.

### 2. Remand is Warranted for ALJ Martin to Explain Why Plaintiff's Condition Does Not Meet Listing 1.04 But ALJ Martin Did Not Need to Obtain Medical Expert Testimony

Plaintiff next argues that the ALJ's decision at step three was erroneous because ALJ

Martin did not obtain medical expert testimony to determine whether Plaintiff's impairments

meet or medically equal the severity of one of the Listings. (Pl. Mem. at 18-19). The

Commissioner argues that the ALJ was correct in her analysis.

Plaintiff provides no analysis and cites to no part of the Record to support a finding that

Plaintiff meets any Listing. The only Listing numbers even mentioned in Plaintiff's Memorandum

are Listings 1.02, 1.04, 11.14, 12.04 and 12.06, which Plaintiff mentions in one sentence,

criticizing the ALJ for "summarily stating that medical listings 1.02, 1.04, 11.14, 12.04, and 12.06

did not apply." (Pl.'s Mem. at 18). Specifically, ALJ Martin found that "the medical evidence does

not document listing-level severity, and no acceptable medical source has observed deficits

equivalent in severity to the criteria of any listed impairment, individually or in combination." (Tr.

29). ALJ Martin's finding as to Listings 1.02, 11.14, 12.04 and 12.06 is supported by substantial

evidence. However, remand is warranted for ALJ Martin to further explained her reasoning on

why the evidence in the record does not support a finding that Plaintiff's condition meets or

medically equals Listing 1.04, relating to disorders of the spine.

### a. Remand is Warranted for ALJ Martin to Explain Why Plaintiff's Condition Does Not Meet Listing 1.04

The record is not clear as to Listing 1.04, relating to "disorders of the spine." Listing 1.04 requires a disorder of the spine, with either "evidence of nerve root compression," "spinal arachnoiditis," or "lumbar spinal stenosis resulting in pseudoclaudication." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04. Here, the record supports the conclusion that Plaintiff had degenerative disc disease, one of the disorders in Listing 1.04. Further, while none of Plaintiff's treating or consulting physicians diagnosed Plaintiff with "spinal arachnoiditis" or "lumbar spinal stenosis resulting in pseudoclaudication," the record is less clear on "evidence of nerve root compression."  Listing 1.04 requires "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04. Here, Dr. Graziosa and Dr. Marini, both treating physicians, diagnosed Plaintiff with cervical radioculopathy,[21] (Tr. 300, 351, 492), and Plaintiff has complained of decreased sensation in her hands and severe pain in her neck and hands. (Tr. 66-68, 70-71). Moreover, several of Plaintiff's treating physicians indicated that Plaintiff had decreased range of motion and neck and hand pain combined with numbness and tingling.[22]

---

[21] Disease of the nerve roots, such as from inflammation or impingement by a tumor or body spur.

[22] Dr. Schwartz noted "cervical nerve root irritation" on Plaintiff's right side, (Tr. 294), Dr. Graziosa noted decreased range of motion and numbness and tingling into portions of Plaintiff's left lower extremity, (Tr. 300, 492), and Dr. Kwan noted that Plaintiff did not have full range of motion during the examination and that she complained of neck pain radiating down her right hand. (Tr. 464, 468). Dr. Rabadi, Plaintiff's chiropractor, also examined Plaintiff. Dr. Rabadi noted limited cervical range of motion, tingling and numbness into Plaintiff's right extremities and moderate right sensorimotor medical nerve neuropathy at her wrist. (Tr. 283-84). Dr. Rabadi diagnosed Plaintiff with radiculopathy and radiculitis, inflammation of the root of the spinal nerve. (Tr. 284, 607-08, 638-40).

ALJ Martin's decision does not adequately explain why the record does not support a finding that Plaintiff's condition meets or medically equals Listing 1.04. Accordingly, remand is warranted for ALJ Martin to consider, after according proper weight to Plaintiffs' treating physicians' medical diagnoses, whether Plaintiff's condition meets or medically equals Listing 1.04.

### b. ALJ Martin's Finding as to Listings 1.02, 11.14, 12.04 and 12.06 is Supported by Substantial Evidence

The evidence in the record does not support a finding that Plaintiff's conditions meet or medically equal the criteria for Listings 1.02 or 11.14. Listing 1.02 requires "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)," with either "involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively"; or "involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, wrist-hand), resulting in inability to perform fine and gross movements effectively." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.02. Such severe limitations are not supported by the record. Moreover, Dr. Greenfield's muscoskeletal examination of Plaintiff revealed that Plaintiff had full range of motion of her shoulders, elbows, forearms, wrists, hips, knees and ankles. (Tr. 480). Dr. Greenfield also found that Plaintiff's fine motor activity of her hands and fingers were intact and her grip strength was 5/5 bilaterally. (Tr. 481). Similarly, Listing 11.14 requires either (1) "disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities"; or (2) "marked limitation in physical functioning," and marked limitation in either "understanding, remembering or applying information," "interacting with others," "concentrating, persisting, or

maintaining pace," or "adapting or managing oneself." Nothing in the record demonstrates that

Plaintiffs' impairments rise to this level. Moreover, Dr. Marini's, Dr. Greenfield's, and Dr.

Bregman's assessment indicate that Plaintiff did not have problems standing up from a seated

position. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.14.

The evidence in the record also does not support a finding that Plaintiff's conditions meet

or medically equal the "paragraph B" or "paragraph C" criteria for Listings 12.04 or 12.06.

Paragraph B of these Listings are identical and call for the presence of at least two of the

following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.02 ¶ B, § 12.04 ¶ B, § 12.06 ¶ B. A "marked" restriction

or difficulty means more than moderate but less than extreme. 20 C.F.R. § Pt. 404, Subpt. P,

App.1. Plaintiff's own statements and the medical evidence discussed above suggest that, if she

has any, Plaintiff has only mild restrictions in any of the functional areas.

Paragraph C of these Listings is also the same for both Listings and calls for a

[m]edically documented history of a chronic organic [mental or affective] disorder of at
least 2 years' duration that has caused more than a minimal limitation of ability to do
basic work activities, with symptoms or signs currently attenuated by medication or
psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a
minimal increase in mental demands or change in the environment would be predicted
to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.02 ¶ C, § 12.04 ¶ C. There is no evidence of Plaintiff having suffered repeated episodes of decompensation, each of an extended duration, or any evidence that Plaintiff is unable to function outside a highly supportive living environment for at least one year. Plaintiff's own statements demonstrate that she is independent and takes care of her activities of daily living inside and outside her home. Plaintiff's mental impairments, considered in totality, do not meet or medically equal Listings 12.04 or 12.06.

### c. ALJ Martin Did Not Need to Obtain Medical Expert Testimony

Plaintiff also makes a cursory argument that the ALJ should have sought the advice of a medical expert to determine if Plaintiff met a Listing. However, Plaintiff has not argued that she has met any particular Listing or pointed to any gap in the record that ALJ Martin should have developed. Therefore, in the absence of any basis for concluding that the record was not sufficiently developed, ALJ Martin was under no obligation to seek additional information, including testimony from a medical expert. *See Rosa v. Callahan*, 168 F.3d 72, 79, n. 5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information . . . .") (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996)); *Rivera v. Comm'r of Social Sec.*, 15 Civ. 8439, 2017 WL 120974, at *10 (S.D.N.Y. Jan. 12, 2017) ("An ALJ is not required to consult a medical expert to determine whether a plaintiff meets a listing."), *report and recommendation adopted*, 2017 WL 946296 (S.D.N.Y. Mar. 9, 2017) (citing 20 C.F.R. § 404.1527(e)(2)(iii) (an ALJ "may . . . ask for and consider opinions from medical experts on the

nature and severity of [a claimant's] impairment(s) and on whether [her] impairment(s) equals the requirements of any impairment" in the Listings.)).

## IV.    Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings be **DENIED** and Plaintiff's motion for summary judgment be **GRANTED** to the extent that the case be **REMANDED** to the Commissioner to further evaluate 1) the treating physicians' diagnoses of disc herniation and cervical radioculopathy; and 2) whether, Plaintiff's condition, after the Commissioner has accorded proper weight to the treating physicians' medical diagnoses, meets or medically equals Listing 1.04.

## V.    Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to Judge McMahon. Any requests for an extension of time for filing objections must be directed to Judge McMahon.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS <u>WILL</u> RESULT IN A WAIVER OF OBJECTIONS AND <u>WILL</u> PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Respectfully submitted,

_s/ Ona T. Wang_

Dated: August 12, 2019                                  **Ona T. Wang**
New York, New York                       United States Magistrate Judge